CHARLES WAYMON BARNES V. STATE.

No. 26,926. April 14, 1954.

No attorney for appellant of record on appeal.

*William H. Scott,* District Attorney, *King C. Haynie,* Assistant District Attorney, and *Wesley Dice,* State's Attorney, Austin, for the state.

GRAVES, Presiding Judge.

Appellant was indicted by the grand jury of Harris County for the unlawful killing of Ella Faye Barnes "by shooting her with a gun, and by stabbing her with a knife, and by hitting and striking her with a piece of wood, and by drowning her by placing the said Ella Faye Barnes in a bathtub and by then and there causing water to run into the said bathtub, whereby water was taken into the lungs of the said Ella Faye Barnes." Upon conviction, the penalty was assessed at death.

The killing is alleged to have occurred on October 6, 1953.

The testimony shows a brutal and malicious killing, not only of Ella Faye Barnes, a girl eleven years of age, but also of her

mother, Winnie Rachel Barnes, as well as the shooting of E. B. Barnes, the father of Ella Faye Barnes, who was a brother of the appellant.

The appellant's confession is present in the record and makes out a complete case of the killing of this child. No reason is given therefor save and except a shadowy claim that the brother, E. B. Barnes, had been going with a woman named Melba Lee Wallace, who was claimed to be a female friend of the appellant.

The testimony is clear and concise relative to the killing of the girl, she having been shot through the head and the bullet entering the brain which would have eventually terminated her life. According to the appellant's own testimony, as well as his confession, she was also struck with a knife, stabbed with a dagger, beaten with a rolling pin and then placed in a bathtub filled with water. The testimony further shows an attempt to rape the child upon the part of the appellant.

There are no mitigating circumstances offered of any kind save and except the fact that appellant claimed that he had had syphilis ever since he was around eleven years of age; that he would get bad headaches at times and would have to sit down until his headache passed away. He stated that he placed this little child's body in a bathtub and turned on the water sufficiently to cover the body and that he saw bubbles coming from her face as she lay there.

There is only one bill of exception in the record and that relates to the testimony of Melba Lee Wallace, the objection thereto being as follows:

"MR. HOLLAND: Your Honor, I would like to take the witness on voir dire?

"COURT: For what purpose?

"MR. HOLLAND: She is the wife of the defendant, your Honor.

"COURT: Are you married to this defendant here?

"WITNESS: No, I am not.

"MR. HOLLAND: She is his common-law wife.

"COURT: Have you lived with him and held yourself out as his wife?

"WITNESS: For a while.

"COURT: Go ahead, Mr. Holland, with your voir dire."

We quote from the direct examination of the witness as follows:

"I never had any intention of marrying the defendant, and it is also true that I was married once when I was sixteen years old in Henderson, Texas. I said that I saw this defendant about three o'clock Wednesday morning. He was in my apartment when I got home that morning. That is the same place I am living now, 2310 McIlhenny Street. The defendant made a statement to me that night about what he had done before I saw him. When I first walked into the room he asked me what was going on and I told him, nothing, and when I went back to the car and paid the cab-driver and came back into the apartment, the defendant told me that he was in trouble, and that was on the morning of Wednesday, October the 7th, this year. He said what kind of trouble he was in when I asked him; he said he had shot his brother. I knew who he was referring to when he said his brother; that was Elijah Barnes. The defendant told me the same morning later on that he had left his shoes and his hat at his brother's house. The defendant told me that his shoes and hat was at Elijah Barnes' house, which is located somewhere out in Galena Manor, or Galena Park, I have forgotten the address."

It was claimed by the appellant's attorney that this woman was appellant's common-law wife, and we think this claim is refuted not only by the statement of Melba Lee Wallace, but also by the testimony of Rose Feronberg, which is as follows:

"My name is Rose Feronberg. I know the defendant in this case, Charles Waymon Barnes. I have lived with the defendant as man and wife. He has held me out as being his wife. The defendant and I had been living together for three weeks up until the time this killing happened.

"COURT: And he was holding you out as his wife at that time?

"WITNESS: Yes, he was.

*    *    *

On cross-examination the witness testified:

"I don't know Melba personally, but I know her name. I have seen her. I knew that she and Charles were living together before he and I started living together."

Again, we quote from the appellant's testimony as follows:

"I have been married; I went through a wedding ceremony in 1950, which was before I went to the penitentiary. I married a girl then by the name of Rita Sharp in Chicago, Illinois."

\* ' \* \*

"In answer to your question, I never had held this Melba Lee Wallace out to be my wife; I had never introduced her around to people as my wife, as I had only been living with her some eight or ten days; I will say, no, sir, we lived together off and on before that. But I said I was married in Chicago in 1950."

The trial court, in an excess of caution, in his charge withdrew from the jury all the testimony given by Melba Lee Wallace. It is our belief that neither one of these women had lived with the appellant for a sufficient length of life and under circumstances that would constitute her to be his common law wife.

In the charge of the court, the jury were further instructed on the law of insanity as a defense to crime and were told that if they believed from a preponderance of the evidence that at the time of this killing the defendant was insane, "as that term has been explained to you in this charge, then you will acquit him on the ground of insanity."

The jury awarded appellant the death penalty, thus finding him to be a sane person at the time this killing occurred, and we see no reason why their verdict should be disturbed herein. This was a useless killing, and no reason therefor is given except the fact that appellant's brother had possibly mistreated him relative to keeping company with another woman with whom appellant seemed to have lived for a short period of time in his brother's home.

Finding no error in the record, the judgment will therefore be affirmed.